UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| FOX DRYWALL & PLASTERING, INC.; S AND S BUILDERS, INC.; G&D VIKING GLASS, INC.; and H&R ROOFING OF SOUTH DAKOTA, INC., | ) ) ) ) ) ) | Civ. 12-4026-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) ) | ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| SIOUX FALLS CONSTRUCTION COMPANY, a South Dakota corporation; and GENE ROLLINGER CONSTRUCTION, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

Defendant, Sioux Falls Construction Company, entered into a contract with the Flandreau Santee Sioux Tribe (the Tribe) to serve as the general contractor for the construction of an addition to the Royal River Casino and Motel near Flandreau, South Dakota. Sioux Falls Construction entered into individual subcontractor agreements with each of the plaintiffs, Fox Drywall & Plastering, Inc., S and S Builders, Inc., G&D Viking Glass, Inc., and H&R Roofing of South Dakota, Inc. (collectively plaintiffs or subcontractors). After the project was completed, the Tribe brought suit against Sioux Falls Construction in the Flandreau Santee Sioux Tribal Court (Tribal Court). Sioux Falls Construction filed a third-party indemnity and contribution action (third-party

complaint) against plaintiffs in Tribal Court. Plaintiffs filed a motion to dismiss based on the Tribal Court's lack of subject matter jurisdiction.

The Tribal Court initially denied the motion to dismiss, and plaintiffs appealed. The Flandreau Santee Sioux Tribal Appellate Court (Tribal Appellate Court) remanded the case to the Tribal Court to conduct an evidentiary hearing. After conducting an evidentiary hearing, the Tribal Court denied the motion to dismiss. The Tribal Appellate Court upheld the Tribal Court's determination that it had jurisdiction over the third-party complaint.

Plaintiffs have now filed an action in federal court and seek a preliminary injunction to enjoin the Tribal Court's assertion of jurisdiction over Sioux Falls Construction's third-party complaint. Sioux Falls Construction resists. On April 24, 2012, the court held a hearing on the preliminary injunction. The motion for a preliminary injunction is denied.

## BACKGROUND

## I.   Factual History

The pertinent facts to this order are as follows:

The Tribe owns the Royal River Casino and Motel, which is located on the Tribe's trust land. On February 7, 2002, the Tribe and Sioux Falls Construction entered into a contract for Sioux Falls Construction to design and build a 60-room expansion to the Royal River Motel. To complete the project, Sioux Falls Construction entered into subcontracts with five subcontractors, including the

2

four plaintiffs and Gene Rollinger Construction, which is not contesting the Tribal Court's jurisdiction.[1] The project was completed on April 1, 2004.

The Tribe discovered multiple issues with the Royal River Motel after the construction was finished. The problems included issues with the fire system, such as omitted or improperly installed draft stops, fire seals, shaft assemblies, and fire stops. Fire-rated walls and ceiling assemblies were not constructed in accordance with the specified UL listing. Several smoke detectors were installed but not wired. According to the Tribe, the issues with the fire protection system "negated the designers' means to protect occupants in case of a fire." Docket 9-1 ¶ 17.

The Tribe also contends that some of the Tribe's requested structural elements were missing, misplaced, damaged, or altered. For example, columns were not installed, shear walls were incomplete and nailed incorrectly, either too few lag bolts or incorrectly-installed lag bolts were used for ledgers, truss hangers were incorrectly installed, and the link area was too small. The elevator shaft was incorrectly located and improperly constructed. Floor joists were damaged and/or altered and not repaired according to the engineer's design. Roof truss members were cut through and left unrepaired or improperly repaired. Walls were improperly framed. The Tribe asserts that "[t]hese breaches

---

[1] "Rollinger was not a party to the appeal between plaintiffs and parties defendant in the Flandreau Santee Sioux Tribal appellate court and thus is only a nominal party to this action." Docket 24 at 2.

and others negated the designers' means to enable the building to resist live loads, dead loads and wind loads." Docket 9-1 ¶ 17.

The Tribe further asserts that issues with the HVAC and plumbing have resulted in overheating in the summer, overcooling in the winter, and a high loss in water pressure. Water heaters were moved to the second floor and are not adequately supported. Moreover, an improperly installed exterior insulation finishing system (EIFS) and flashings resulted in water intrusion, mold, and rot. An improperly installed EPDM (ethylene propylene diene monomer, a type of rubber) roof resulted in overloading, poor drainage, and water intrusion in the walls. Several areas of the exterior walls had the thermal insulation omitted, which resulted in higher heating and cooling loads, condensation, and other issues. Docket 9-1 ¶ 17.

On March 18, 2008, the Tribe brought suit against Sioux Falls Construction in the Tribal Court alleging breach of warranty, deceit, bad faith, and breach of the independent duty of habitability. The Tribe seeks compensatory and punitive damages. Docket 9-1. Sioux Falls Construction has not objected to the Tribal Court's jurisdiction over the Tribe's complaint.

On August 22, 2008, Sioux Falls Construction filed its third-party complaint against plaintiffs and Gene Rollinger. Docket 9-3. On March 11, 2009, S and S Builders moved the Tribal Court to dismiss the third-party complaint for lack of subject matter jurisdiction pursuant to Flandreau Sioux

Tribal Code ¶ 4-4-2(1). Docket 9-4. On March 12, 2008, Fox Drywall joined S and S Builders' motion to dismiss. Docket 9-5.

## II.    Procedural History

On July 9, 2009, Tribal Court Judge Sherman Marshall denied the motion to dismiss and found that the Tribal Court had jurisdiction over the action. Docket 9-6. The subcontractors filed a discretionary (interlocutory) appeal with the Tribal Appellate Court on whether the Tribal Court had subject matter jurisdiction over the third-party complaint. Docket 9-7.

The Tribal Appellate Court found that an insufficient evidentiary basis existed to determine whether the Tribal Court had jurisdiction:

> In the course of the quite able oral argument presented to the Court, it became clear that there was an insufficient record developed in the trial court from which to confidently ascertain the precise relationship of the subcontractors to the Flandreau Santee Sioux Tribe. The nature of that relationship is, of course, the bedrock inquiry which is necessary to determine whether the jurisdictional test established in the 'pathmarking' case of *Montana v. United States*, 450 U.S. 544 (1981) is satisfied.

Docket 9-7 at 3-4. After providing a number of issues for the Tribal Court to clarify on remand, the Tribal Appellate Court remanded the case to the Tribal Court to conduct an evidentiary hearing:

> What is not adequately present in the current record before this Court, as noted elsewhere, is sufficient evidence—documentary and testimonial—with which to reach a reliable conclusion as to the nature and extent of "commercial dealing" between the parties, especially between the Flandreau Santee Sioux Tribe and the subcontractors. It is this deficiency, which provides the basis of this remand to the trial court to conduct the necessary evidentiary hearing in accordance with the guidelines described above.

Docket 9-7 at 7. The Tribal Appellate Court remanded the action to the Tribal Court and reasoned that the subcontractors had not yet exhausted their tribal court remedies. Docket 9-7 at 7.

The Tribal Court conducted an evidentiary hearing on April 29, 2010. Representatives from each of the subcontractors testified, but neither an official from the Tribe nor a representative from Sioux Falls Construction was called to testify. Docket 9-8 at 3. After receiving the additional evidence, the Tribal Court found that sufficient "commercial dealings" existed between the Tribe and Sioux Falls Construction to confer jurisdiction on the Tribal Court over the third-party complaint. Docket 9-8 at 7. The subcontractors filed a second intermediate appeal with the Tribal Appellate Court.

The Tribal Appellate Court heard oral argument on May 23, 2011, and all three parties, the Tribe, Sioux Falls Construction, and the subcontractors, participated in the oral argument. Docket 9-9 at 3.

The Tribal Appellate Court held that the Tribal Court had jurisdiction over the third-party complaint under *Montana*. The Tribal Appellate Court found that nine key factors supported the application of *Montana*: (1) the project was performed on Tribal trust land located within the reservation's boundaries; (2) the project involved the Tribe as the project's owner; (3) the subcontracts recognized the regulatory authority of the Owner/Tribe to order subcontractors to suspend and/or terminate work on the project; (4) the subcontracts referenced and incorporated the agreement between the Tribe and Sioux Falls

6

Construction; (5) Sioux Falls Construction and subcontractors are named parties in the Tribe's lawsuit against Sioux Falls Construction for work performed for the Tribe on Tribal trust land; (6) all defendants, including the subcontractors, knew that they were performing work for the Tribe on Tribal land; (7) the subcontracts expressly identified the direct liability of the subcontractors to the Tribe; (8) the subcontractors manifested written consent and willingness for disputes to be resolved in a single forum; and, (9) only the Tribal Court would have authority over all of the disputes involved in this lawsuit. Docket 9-9 at 11-12.

The Tribal Appellate Court found that these facts supported the application of *Montana* because the project would not have occurred without all three of the interlocking parties. Docket 9-9 at 4 (citations to the Tribal Court record omitted). The Tribal Appellate Court, citing Paragraphs 2.3, 3.1, 3.2, 8.3.1, 11.4, and 12.1 of the subcontracts, reasoned that the subcontracts "expressly reflect the tri-partite nature of th[e] construction undertaking. . . . These provisions, individually and collectively indicate the pervasive presence and reliance on the interlocking rights and responsibilities of all *three* parties." Docket 9-9 at 5 (emphasis in original). The Tribal Appellate Court further reasoned that "it appears from the record . . . that the Tribe expected all legal matters relative to this three way commercial endeavor to be settled in Tribal court." Docket 9-9 at 8.

In its reasoning, the Tribal Appellate Court relied not only on *Montana* but also on *Williams v. Lee*, 358 U.S. 217 (1959). " 'There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of tribal courts over Reservation affairs and hence would infringe on the right of Indians to govern themselves. It is immaterial that respondent is not an Indian.' " Docket 9-9 at 10 (quoting *Williams*, 358 U.S. at 223). Relying on all of these factors, the Tribal Appellate Court concluded that the Tribal Court had jurisdiction under *Montana* and, additionally, on non-*Montana* grounds based on *Williams*. Docket 9-9 at 10.

The Tribal Appellate Court remanded the case back to the Tribal Court. Plaintiffs then filed this action in federal court and seek to enjoin further Tribal Court action over the third-party complaint. Only the preliminary injunction is at issue here.

## DISCUSSION

Before a federal court grants preliminary relief, it must have jurisdiction over the matter. *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1422 (8th Cir. 1996). Whether a tribal court has adjudicative authority over a non-tribal member presents a federal question. *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008) (citing *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15 (1987)). Federal law governs the outcome. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 852 (1985). Accordingly, the question falls under this court's "arising under federal law"

8

jurisdiction in 28 U.S.C. § 1331. *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 483 (1999).

The doctrine of tribal exhaustion, subject to limited exceptions, requires a party to exhaust its case in tribal court before seeking relief in a federal court, including questions of jurisdiction. *Nevada v. Hicks*, 533 U.S. 353, 369 (2001); *Nat'l Farmers*, 471 U.S. at 856-57. Here, the parties have exhausted their tribal court remedies, and the court has jurisdiction to review plaintiffs' preliminary injunction motion.

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 845 (8th Cir. 2003) (citing *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995); *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)). The moving party must make the familiar four-part showing before the court issues a preliminary injunction: (1) the threat of irreparable harm by the movant; (2) the balance between this harm and the injury that granting the injunction will inflict on the other parties; (3) the probability that the movant will succeed on the merits; and, (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). This is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (citations omitted).

## I.  Probability of Success on the Merits

"The most important of the *Dataphase* factors is the . . . likelihood of success on the merits." *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). *See also Lankford v. Sherman*, 451 F.3d 496, 507 (8th Cir. 2006) (reasoning that probability of success on the merits is a critical factor in determining whether a court should issue a preliminary injunction).

In this context, "probability of success on the merits" means that the moving party must show that it has "a 'fair chance' of success on the merits[.]" *Planned Parenthood of Minn, N.D., S.D. v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008) (internal citation omitted). A "fair chance of prevailing" does not require a greater than fifty percent likelihood of prevailing on the merits. *See id.* at 731 (citing *Dataphase*, 640 F.2d at 113). Plaintiffs bear the burden to prove that they have a fair chance of success in showing that the Tribal Court lacks jurisdiction over the third-party complaint.

Plaintiffs argue that the Tribal Court lacks subject matter jurisdiction over the third-party complaint. The issue here is whether the Tribe's adjudicatory authority over non-members in this civil matter stems from the Tribe's "retained or inherent sovereignty." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 649-50 (2001).[2]

---

[2] "For powers not expressly conferred upon them by federal statute or treaty, Indian tribes must rely upon their retained or inherent sovereignty." *Atkinson*, 532 at 649-50. Because no statute or treaty confers power to the Tribe in this case, the Tribe must rely on its "retained or inherent sovereignty."

10

The Supreme Court defined the scope of a tribal court's civil jurisdiction over non-members on non-Indian fee land in the seminal case of *Montana v. United States*, 450 U.S. 544 (1981). *See also Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997) (reasoning that *Montana* is a "pathmarking case concerning tribal civil authority over nonmembers."). In *Montana,* the Court held that the Crow Tribe lacked the power to prohibit hunting and fishing by nonmembers on non-Indian fee land within the reservation because the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes." 450 U.S. at 564. The Court further reasoned that generally "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565. The Court recognized two exceptions to this basic rule. First, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* (citations omitted). Second, "[a] tribe may also . . . exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the

political integrity, the economic security, or the health or welfare of the tribe." *Id.* (citations omitted). The second exception is not an issue in this case.[3]

Although *Montana* did not address a tribal court's civil jurisdiction over nonmembers on Indian trust land within the reservation, the Supreme Court in subsequent opinions appears to have extended its holding in *Montana* to nonmember activity on Indian trust land. *See Hicks*, 533 U.S. at 360 (reasoning that *Montana* "clearly impl[ied] that the general rule of *Montana* applies to both Indian and non-Indian land."). In *Strate*, the Supreme Court reasoned that a tribe's adjudicative authority extends to the boundaries of a tribe's regulatory authority as articulated in *Montana*. 520 U.S. at 452 ("[W]here tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.' " (alterations in original) (quoting *Iowa Mut.*, 480 U.S. at 18)).

The Eighth Circuit Court of Appeals has also agreed that the general rule in *Montana* applies to both Indian and non-Indian land. *Sac & Fox*, 609 F.3d at 936 ("*Montana's* analytic framework now sets the outer limits of tribal civil jurisdiction—both regulatory and adjudicatory—over nonmember activities on tribal and nonmember land."). "The ownership status of land, in other words, is

---

[3] In order for the second *Montana* exception to apply, "[t]he conduct must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community." *Plains Commerce*, 554 U.S. at 341 (quoting *Montana*, 450 U.S. at 566). During the hearing, Sioux Falls Construction conceded that the second exception does not apply to this case.

only one factor to consider in determining whether regulation of the activities of

nonmembers is necessary to protect tribal self-government or to control

internal relations[,]" even though "[i]t may sometimes be a dispositive factor."

*Hicks*, 533 U.S. at 360 (quotations omitted). *See also Sac & Fox*, 609 F.3d at

940 ("Tribal civil authority is at its zenith when the tribe seeks to enforce

regulations stemming from its traditional powers as a landowner." (citations

omitted)). Thus, *Montana* controls this analysis.

Under the first *Montana* exception, the court first determines if the

nonmember has consented to tribal jurisdiction. *Plains Commerce*, 554 U.S. at

337. If the court finds that the nonmember has consented, the court must next

determine whether the regulation asserted "stem[s] from the tribe's inherent

sovereign authority to set conditions on entry, preserve tribal self-government,

or control internal relations." *Id.* (citing *Montana*, 450 U.S. at 564).

### A.    Consensual Relationship

A "consensual relationship" exists if the nonmember has expressly

consented to a tribe's law or has indirectly consented through his actions.

*Plains Commerce*, 554 U.S. at 337. "The *Montana* exceptions focus on the

activities of nonmembers or the conduct of non-Indians." *Sac & Fox*, 609 F.3d

at 937 (quotations omitted).

"Tribal court jurisdiction thus 'turns upon whether the actions at issue

in the litigation are regulable by the tribe.' " *Id.* at 936 (quoting *Hicks*, 533 U.S.

at 367 n.3). If the tribe possesses the authority to regulate the nonmember's

13

activity at issue in the case, then " 'civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts.' " *Id.* at 936 n.5 (quoting *Strate*, 520 U.S. at 453). "[C]ourts applying *Montana* should not simply consider the abstract elements of the tribal claim at issue, but must focus on the specific nonmember conduct alleged, taking a functional view of the regulatory effort of the claim on the nonmember." *Id.* at 938.

### 1.    Non-Contractual Factors

On remand from the Tribal Appellate Court, the Tribal Court held an evidentiary hearing regarding the extent of plaintiffs' connections with the Tribe. While the court reviews the Tribal Court's factual findings "under a 'deferential, clearly erroneous standard,' " *Prescott v. Little Six, Inc.*, 387 F.3d 753, 757 (8th Cir. 2004) (quoting *Duncan Energy v. Three Affiliated Tribes*, 27 F.3d 1294, 1300 (8th Cir. 1994)), the court also conducted a hearing on plaintiffs' preliminary injunction.

During the hearing, a representative from each plaintiff testified that he knew that the Tribe owned the Royal River Motel. Plaintiffs' representatives testified that they were paid by Sioux Falls Construction for their work but acknowledged on cross-examination that Sioux Falls Construction probably was paid by the Tribe so that Sioux Falls Construction could pay plaintiffs.

Importantly, there was no dispute before the Tribal Court, the Tribal Appellate Court, or this court that the Royal River Motel was located on the Tribe's trust land. Writing for the majority in *Hicks*, Justice Scalia stated that

14

the "ownership status of land . . . may sometimes by a dispositive factor." 533 U.S. at 360. The Eighth Circuit has also acknowledged " 'the critical importance of land status' to questions of tribal jurisdiction under *Montana*." *Sac & Fox*, 609 F.3d at 940 (quoting *Plains Commerce*, 554 U.S. at 338). In fact, the Eighth Circuit has reasoned that "[t]ribal civil authority is at its zenith when the tribe seeks to enforce regulations stemming from its traditional powers as a landowner." *Id.* (citations omitted).

As a landowner and motel-owner, the Tribe desired to make improvements to its land and the buildings on its property. In order to do so, it entered into a general contract with Sioux Falls Construction. The general contract acknowledged that Sioux Falls Construction would enter into subcontracts.

During the hearing, plaintiffs' representatives repeatedly testified that Sioux Falls Construction, not the Tribe, oversaw and inspected their work. The representatives also testified that they did not have to acquire a building permit or license or pay a tax to work on the Tribe's land. But the Tribe had the regulatory authority to  prescribe building codes, require subcontractors to obtain licenses, and require subcontractors to pay a tax to work on the Tribe's land. "If the Tribe retains the power under *Montana* to regulate [nonmember] conduct," it makes no "difference whether it does so through precisely tailored regulations or through" litigation in tribal court. *Sac & Fox*, 609 F.3d at 938. Thus, the fact that the Tribe chose not to impose regulations, codes, licenses,

15

or taxes on the subcontractors does not preclude the Tribal Court's jurisdiction over the third-party complaint.

Moreover, during the course of construction, weekly meetings were held on the project site, which is on the Tribe's trust land. Not only did plaintiffs work on the Tribe's trust land, but they also met on its land to discuss the project's progress.

While plaintiffs repeatedly testified that the Tribe did not oversee their work, this fact is inconsequential because plaintiffs agreed that Sioux Falls Construction, not the Tribe, would provide the general direction for their work. Docket 9-2 ¶ 2.1 ("The Subcontractor shall perform the Subcontract Work under the general direction of the Design-Builder and in accordance with the Subcontract Documents."). The Tribe and Sioux Falls Construction similarly agreed that Sioux Falls Construction would supervised plaintiffs. Docket 38-1 ¶ 5.2.

In summary, the court gives significant weight to the facts that plaintiffs knew that the Tribe owned the motel, that the motel was located on Tribal trust land, and that the Tribe had the power to regulate the subcontractors' work through building permits, codes, and licenses.

### 2.   Contractual Provisions

The Tribe and Sioux Falls Construction entered into a general contract. The general contract is a form contract from the Associated General Contractors of America, entitled "AGC Document No. 410." The general

16

contract names the "Flandreau Santee Sioux Tribe" as the "Owner" of the project and "Sioux Falls Construction Company" as the "Design-Builder." Docket 38-1, Article 1. The general contract also defines "subcontractor." Docket 38-1 ¶ 2.3.12 ("A *Subcontractor* is a party or entity retained by the Design-Builder as an independent contractor to provide the on-site labor, materials, equipment and/or services necessary to complete a specific portion of the work.").

The Tribe retained the contractual right to suspend, delay, or interrupt Sioux Falls Construction's work if necessary. Docket 38-1 ¶ 12.1.1 ("The Owner may order the Design-Builder in writing to suspend, delay or interrupt all or any part of the Work without cause for such period of time as the Owner may determine to be appropriate for its convenience.").

In Article 5 of the general contract, the Tribe and Sioux Falls Construction agreed that "[w]ork not performed by the Design-Builder with its own forces shall be performed by Subcontractors or the Architect/Engineer." Docket 38-1, Article 5. The Tribe had the contractual right to object to any subcontractor chosen by Sioux Falls Construction. Docket 38-1 ¶ 5.1. Sioux Falls Construction, not the Tribe, maintained the contractual duty to supervise the subcontractors. Docket 38-1 ¶ 5.2 ("The Design-Builder shall be responsible for the management of the Subcontractors in the performance of their work."). The Tribe and Sioux Falls Construction also agreed that, in entering into subcontracts, Sioux Falls Construction would bind the

17

subcontractors to the general contract. Docket 38-1 ¶ 5.4 ("The Design-Builder agrees to bind every Subcontractor and Material Supplier (and require every Subcontractor to so bind its Subcontractors and Material Suppliers) to all the provisions of this Agreement and the Contract Documents as they apply to the Subcontractor's and Material Supplier's portions of the work.").

The Tribe and Sioux Falls Construction further agreed to a dispute resolution scheme in the event that a dispute arose between the parties. "The Parties by mutual agreement may submit the dispute to Binding Arbitration after the Mediation Process has failed or they may bring suit in the proper court having jurisdiction over the subject matter and the parties to the dispute." Docket 38-1, Exhibit 1 to ¶ 13.3. Most importantly, Sioux Falls Construction and the Tribe agreed "that all parties necessary to resolve a claim shall be parties to the same dispute resolution proceeding. Appropriate provisions shall be included in all other contracts relating to the Work to provide for the consolidation of such dispute resolution proceedings." Docket 38-1 ¶ 13.4 ("mulitparty proceeding" clause).

The Tribe and Sioux Falls Construction further agreed that the Tribe's laws would control the project. Docket 38-1 ¶ 14.2 ("This Agreement shall be governed by the law in effect at the location of the Project."). Moreover, the only forum in which the Tribe can be sued without being forced to waive its

sovereign immunity from suit is in its Tribal Court.[4] Sioux Falls Construction and plaintiffs do not dispute that the Tribal Court has jurisdiction over the Tribe's complaint against Sioux Falls Construction.

Each plaintiff entered into an identical subcontract with Sioux Falls Construction. Docket 9-2 at 21, 22, 23, and 24. The subcontracts, like the general contract, are form contracts from the Associated General Contractors of America and are entitled "AGC Document No. 455." The subcontracts identify "Sioux Falls Construction Company" as the "Design-Builder," the "Flandreau Santee Sioux Tribe" as the "Owner," and each subcontractor as the company responsible "for services in connection with the Subcontract Work." Docket 9-2, Article 1. Article 1 also provides that "[n]otice to the parties shall be given at the above addresses." Docket 9-2, Article 1. Thus, according to the subcontracts, the Tribe should have received notice of each subcontract entered into between Sioux Falls Construction and each plaintiff.

The subcontracts acknowledge that plaintiffs were completing work for the Tribe. For example, the subcontracts state that the work to be performed

---

[4] "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) (citations omitted). If the tribe has sovereign immunity from a lawsuit, that immunity extends to tribal agencies, instrumentalities, tribal courts, and tribal officers operating within the scope of their authority. *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997) (tribal defendants are entitled to sovereign immunity in official capacity claims); *Melby v. Grand Portage Band of Chippewa*, No. CIV. 97-2065, 1998 WL 1769706, at *3 (D. Minn. Aug. 13, 1998) (acknowledging that tribal courts—as tribal entities—are immune from suit).

by plaintiffs is a portion of the work that Sioux Falls Construction owed to the Tribe. Docket 38-1 ¶ 2.2 ("The Design-Builders's work is the construction and services required of the Design-Builder to fulfill its obligations pursuant to its agreement with the Owner (the Work). The Subcontract Work is a portion of the Work."). Moreover, the general contract was included in the subcontract documents. Docket 9-2 ¶ 2.3 ("The Subcontract Documents include . . . the Owner-Design-Builder agreement[.]").

Paragraph 3.1 provides that plaintiffs owe the same duties to Sioux Falls Construction as it owes to the Tribe. Docket 9-2 ¶ 3.1 ("[T]he Subcontractor assumes toward the Design-Builder all the same obligations, rights, duties, and remedies that the Design-Builder assumes toward the Owner."). In paragraph 3.2, plaintiffs agreed to furnish their "best skill and judgment in the performance of the Subcontract Work and to cooperate with the Design-Builder so that the Design-Builder may fulfill its obligations to the Owner," and that plaintiffs would use their best efforts to hire "local" workers. Docket 9-2 ¶ 3.2. Plaintiffs also agreed to provisions acknowledging that the Tribe could suspend or terminate work on the project. Docket 9-2 ¶¶ 10.3, 10.4.

The subcontracts also provide a detailed dispute resolution scheme. Plaintiffs agreed to indemnify Sioux Falls Construction for any damages that might arise from their work:

> To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Design-Builder, the Design-Builder's other subcontractors, the Architect/Engineer, the Owner and their agents, consultants and employees (the

20

> Indemnitees) from all claims for bodily injury and property damage
> that may arise from the performance of the Subcontract Work to
> the extent of the negligence attributed to such acts or omissions by
> the Subcontractor, the Subcontractor's subcontractors or anyone
> employed directly or indirectly by any of them or by anyone for
> whose acts any of them may be liable.

Docket 9-2 ¶ 9.1.1. Plaintiffs agreed to no limitation on liability. Docket 9-2

¶ 9.1.2. Most importantly, plaintiffs agreed that if a judicial proceeding was

necessary to resolve a claim, plaintiffs would be a party in the same proceeding

as Sioux Falls Construction:

> The parties agree that to the extent permitted by Subcontract
> Document[s][5] all parties necessary to resolve a claim shall be
> parties to the same dispute resolution proceeding. To the extent
> disputes between the Design-Builder and Subcontractor involve in
> whole or in part disputes between the Design-Builder and the
> Owner, disputes between the Subcontractor and the Design-
> Builder shall be decided by the same tribunal and in the same
> forum as disputes between the Design-Builder and the Owner.

Docket 9-2 ¶ 11.4 ("multiparty proceeding" clause). Plaintiffs further agreed to

be "governed by the law in effect at the location of the Project." Docket 9-2

¶ 12.1.

During the hearing, the parties agreed that in interpreting the multiparty

proceeding clause, the court should rely on precedent for forum selection

clauses. Plaintiffs, citing *Ninigret Development Corp. v. Narragansett Indian

Wetuomuck Housing Authority*, 207 F.3d 21 (1st Cir. 2000), argue that a forum

selection clause, i.e., Paragraph 11.4, cannot provide the sole basis for tribal

---

[5] "Subcontract Documents" include the general contract, Docket 9-2 ¶ 2.3,
which contains a similar multiparty proceeding clause. Docket 38-1 ¶ 13.4.

court jurisdiction. In *Ninigret*, the First Circuit held that "the determination of the existence and extent of tribal court jurisdiction must be made with reference to federal law, not with reference to forum-selection provisions that may be contained within the four corners of an underlying contract." *Id.* at 33 (citing *Nat'l Farmers*, 471 U.S. at 855-56).

This court, however, is bound by Eighth Circuit precedent. The Eighth Circuit has generally held that " '[f]orum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid.' " *Servewell Plumbing, LLC v. Fed. Ins. Co.*, 439 F.3d 786, 789 (8th Cir. 2006) (quoting *M.B. Rests., Inc. v. CKE Rests., Inc.*, 183 F.3d 750, 752 (8th Cir. 1999)). *See also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (reasoning that "there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court," and "[w]here such forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process." (quotations omitted)). If "the forum selection clause is the fruit of an arm's-length negotiation, the party challenging the clause bears an especially 'heavy burden of proof' to avoid its bargain." *Servewell*, 439 F.3d at 789 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1972)). "Only 'some compelling and countervailing reason' will excuse enforcement of a bargained-for forum selection clause." *Id.* (quoting *Bremen*, 407 U.S. at 12).

In resolving the interplay between forum selection clauses and tribal court jurisdiction, the Eighth Circuit has utilized traditional contract principles. In *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230 (8th Cir. 1995), the Eighth Circuit held that the tribal court exhaustion doctrine did not apply because the parties' contract included a valid forum selection clause. *Id.* at 1233. In *Carlow*, the forum selection clause stated that "[i]n the event there is any dispute between the parties arising out of this agreement it shall be determined in the Oglala Sioux Tribal Court *or* other court of competent jurisdiction." *Id.* at 1233 (quotations omitted). The Eighth Circuit reasoned that because "[t]he contracting parties agreed that a plaintiff could sue either in the federal district court of South Dakota . . . or in the tribal court," that the parties did not need to exhaust their tribal remedies before bringing an action in the district court. *Id. See also United States ex rel. Steele v. Turn Key Gaming, Inc.*, 135 F.3d 1249, 1250 n.1 (8th Cir. 1998) (stating that the Oglala Sioux Tribal Court dismissed a suit for lack of jurisdiction because the tribe signed a contract with a forum selection clause requiring the tribe to bring litigation in the federal district court (citing *Oglala Sioux Tribe v. Turn Key Gaming, Inc.*, No. Civ. 96-1006, mem. Op. at 4-5 (Oglala Sioux Tribal Ct. Mar. 7, 1997))); *Larson v. Martin*, 386 F. Supp. 2d 1083, 1087-88 (D.N.D. 2005) (reasoning that "when the negotiating parties have agreed to an appropriate forum, exhaustion of tribal remedies is not required." (citing *Carlow*, 64 F.3d at 1233)).

23

Moreover, the Supreme Court and the Eighth Circuit have utilized traditional contract principles in resolving other contract issues in the tribal court jurisdiction context. *See, e.g.*, *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 233 (8th Cir. 2008) (reasoning that, based on the presumptive validity of arbitration clauses, the tribe waived its sovereign immunity to be sued in state court when it signed a contract with an arbitration clause); *C & L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001) (same).

This case presents a slightly different factual scenario than that in *Carlow*. Paragraph 11.4 is not entitled "forum selection clause," but rather "multiparty proceeding." In interpreting the multiparty proceeding clause, the court should "examine the contract as a whole and give words their 'plain and ordinary meaning.'" *Gloe v. Union Ins. Co.*, 694 N.W.2d 252, 260 (S.D. 2005) (quoting *Elrod v. Gen. Cas. Co. of Wis.*, 566 N.W.2d 482, 486 (S.D. 1997)).

When the subcontracts are read as a whole, the sum of the subcontracts' provisions establishes an interconnected tri-partite relationship[6] between the Tribe, Sioux Falls Construction, and plaintiffs. Through their actions and the express provisions in the subcontracts, plaintiffs consented to regulation by the Tribe, which confers jurisdiction on the Tribal Court. If the Tribe has the power to regulate the nonmember activity at issue here, then "civil jurisdiction over

---

[6] The Tribal Appellate Court referred to the relationship between the Tribe, Sioux Falls Construction, and plaintiffs as a "tri-partite relationship." Docket 9-9 at 4. The court adopts this apt description of the parties' relationship.

disputes arising out of such activities presumptively lies" in the Tribal Court. *Sac & Fox*, 609 F.3d at 936 n.5. Plaintiffs agreed that the action should "be decided by the same tribunal," *without any limitation*. The Tribe brought suit against Sioux Falls Construction in the Tribal Court alleging violations of the Tribe's laws, which is proper under the general contract. Docket 38-1, Exhibit 1 to ¶¶ 13.3, 14.2. According to the subcontract, jurisdiction would be proper in the Tribal Court because plaintiffs are necessary parties to the indemnity portion of the action. Docket 9-2 ¶ 11.4. Moreover, it is logical to deduce that plaintiffs have consented to the Tribal Court's jurisdiction because plaintiffs knew their work was for the Tribe, the job site was the Tribally-owned motel, the Tribe's law governed because they were working on Tribal land, and any legal action would be decided by the same tribunal.

    This finding is consistent with Eighth Circuit precedent and district court cases within this circuit, which routinely uphold forum selection clauses in agreements between general contractors and subcontractors. *See, e.g.*, *Servewell*, 439 F.3d at 789-91 (upholding forum selection and choice-of-law clauses in a subcontract); *Carlow*, 64 F.3d at 1233 (same); *CCI of Ark., Inc. v. Baggette Constr., Inc.*, No. 4:09-CV-00513, 2009 WL 3010986, at *3 (E.D. Ark. Sept. 17, 2009) (same). The result is not changed by the use of a pre-printed form or by a party's failure to examine the agreement carefully. *See, e.g.*, *C & L Enters.*, 532 U.S. at 423 (upholding a form contract with an arbitration clause

to determine if tribal court jurisdiction existed); *Midwest Mech. Contractors, Inc.*

*v. Tampa Constructors, Inc.*, 659 F. Supp. 526, 531 (W.D. Mo. 1987) (upholding

a forum selection clause in a subcontract and reasoning that "[t]he use of

pre-printed forms standing alone is not fraudulent or oppressive. Likewise,

failure of defendant's negotiators to read carefully the contents of the

subcontracts before they were executed does not void the forum selection

clause.").

    During the hearing, plaintiffs argued that Paragraph 2.5 in the

subcontracts explicitly states that the subcontract does not establish a

relationship between plaintiffs and the Tribe. Paragraph 2.5 states that

> [n]othing in this Agreement shall be construed to create a
> contractual relationship between persons or entities other than the
> Design-Builder and Subcontractor. This Agreement is solely for the
> benefit of the parties, represents the entire and integrated
> agreement between the parties, and supersedes all prior
> negotiations, representations, or agreements, either written or oral.

Docket 9-2 ¶ 2.5. Plaintiffs argue that they did not enter into a *direct*

contractual relationship with the Tribe and that Paragraph 2.5 prohibits Sioux

Falls Construction's contractual relationship with the Tribe from extending to

plaintiffs.

    The standard for determining whether a consensual relationship exists

between plaintiffs and the Tribe under *Montana* is not whether the relationship

was "direct." Plaintiffs, citing *Hicks*, argue that the "consensual relationship"

must be a direct relationship. 533 U.S. at 359 n.3. In *Hicks*, the Supreme

26

Court interpreted the "other arrangements" language from the *Montana* test[7] and reasoned that "an 'other arrangement' is clearly another *private consensual* relationship, from which the official actions at issue in this case are far removed." *Id.* But in *Plains Commerce*, which was decided after *Hicks*, the Supreme Court reasoned that a "consensual relationship" exists if a party expressly consents to a tribe's laws *or* consents to a tribe's laws through his actions. *Plains Commerce*, 554 U.S. at 337. Thus, a direct contract between plaintiffs and the Tribe is unnecessary.

Sufficient facts exist to show that plaintiffs entered into a consensual relationship with the Tribe. Those facts include the location of the job site on Tribal trust land, the Tribe's known ownership of the Royal River Motel, the Tribe's payment for the work to Sioux Falls Construction, which then paid plaintiffs, the Tribe's participation in regular progress meetings with Sioux Falls Construction and plaintiffs on the job site, and the express terms of the subcontracts, which included among other provisions that the law in effect at the job site would apply and that all parties necessary to resolve a dispute would participate in the same dispute resolution proceeding.

**B.     Inherent Sovereign Authority**

---

[7] "*Montana* recognized an exception to this rule for tribal regulation of 'the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.' " *Hicks*, 533 U.S. at 359 n.3. (quoting *Montana*, 450 U.S. at 565).

Having found that plaintiffs consented to Tribal jurisdiction through its actions, the court must next review whether the Tribal Court has inherent sovereign authority to adjudicate this matter. *Plains Commerce*, 554 U.S. at 337 (citing *Montana*, 450 U.S. at 564). This analysis "require[s] a careful examination[.]" *Strate*, 520 U.S. at 449.

The Supreme Court has repeatedly upheld a tribe's inherent sovereign authority to "control economic activity within its jurisdiction[.]" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982) (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824)). The "traditional notions of Indian sovereignty" include an " 'overriding goal' of encouraging tribal self-sufficiency and economic development." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216-17 (1987) (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983)). For example, the Supreme Court has upheld a tribe's right to impose taxes on tribal land, *Merrion*, 455 U.S. at 137, and reasoned that a state cannot tax a tribe's royalty interests in oil and gas leases issued to non-Indian lessees. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 765-67 (1985). The Supreme Court has also recognized the importance of gaming to tribes which depend on gaming as a source of revenue. *Cabazon Band*, 480 U.S. at 219  (reasoning that the county had no authority to apply an ordinance regulating bingo and prohibiting playing of draw poker inside a reservation).

28

Here, the Tribe entered into a contractual agreement with Sioux Falls Construction to construct an addition to the Tribally-owned Royal River Motel. The general contract acknowledged that Sioux Falls Construction would enter into subcontracts to complete the necessary work. *See generally*, Docket 38-1, Article 5. All parties agreed that Tribal law would govern the contractual relationships. *See* Docket 38-1 ¶ 14.2; Docket 9-2 ¶ 12.1. The principles behind finding tribal sovereignty under *Montana*, namely, encouraging tribal self-sufficiency and economic development, support finding that the Tribal Court has jurisdiction over the third-party complaint.

*Hicks* further instructs the court to balance plaintiffs' and the Tribe's interests in determining if the Tribe has inherent sovereign authority to regulate the matter. 533 U.S. at 374. This project occurred entirely on Tribal trust land and affects the Tribe's property rights. Tribal members who work at or are guests at the motel could be subjected to potentially hazardous conditions, including rot, mold, and a potentially ineffective fire notification and prevention system. If an injury were to occur at the motel, the Tribe could be liable for damages. Thus, the Tribe's interest is high.

Contrastingly, plaintiffs' interest is low because plaintiffs agreed to indemnify Sioux Falls Construction if their work resulted in a lawsuit against Sioux Falls Construction. If the Tribe is successful in its lawsuit against Sioux Falls Construction, the contribution and indemnity claim will need to be

29

resolved in a court of law. The Tribal Court is equally as qualified as a state court to resolve the indemnity and contribution claims. Furthermore, resolving all the claims in one court of law would provide for judicial and litigant economy.

Because plaintiffs have not shown that they have a fair chance of prevailing on the merits of their claim that the Tribal Court lacks jurisdiction over the third-party complaint, the first factor weighs in favor of denying the preliminary injunction.

## II.    Irreparable Harm

The other key factor in the preliminary injunction analysis is whether the moving party will suffer irreparable harm if the injunction is not granted. *Scallen*, 530 F.2d at 206; *see also Rounds*, 530 F.3d at 732 n.5 (" 'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " (quoting *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959))). Because the lack of irreparable harm will preclude preliminary injunctive relief regardless of the other factors, *Dataphase*, 640 F.2d at 114 n.9, the moving party must demonstrate a sufficient threat of irreparable harm. *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam).

Plaintiffs will not be irreparably harmed if the court denies their preliminary injunction because the Tribe's complaint against Sioux Falls

Construction will still be litigated in Tribal Court and the third-party complaint for indemnity and contribution will be litigated in either Tribal Court or state court. Regardless of the forum, if a judgment is entered in favor of the Tribe, plaintiffs may be liable to Sioux Falls Construction. Thus, the irreparable harm factor weighs in favor of denying the preliminary injunction motion.

## III.    Balancing the Harms

The balance of the harms factor requires the court to determine and balance the harms that would result in the following scenarios: (1) if the court improperly denied the preliminary injunction; and (2) if the court improperly granted the preliminary injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("[W]hile cases frequently speak in the short-hand of considering the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is *improperly* granted or denied[.]"); *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) (announcing a similar test); *see also Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1142 (D. Minn. 1996) (balancing the harms by looking at what the harm to the defendant would be if the injunction were "improperly granted").

If the court improperly denies the injunction, plaintiffs will expend money to litigate this action in Tribal Court. If the court improperly grants the injunction, it will deny the Tribe and the Tribal Court their inherent sovereign authority to regulate economic activity on Tribal trust land. Moreover, if the court improperly grants the preliminary injunction motion, it essentially would be rewriting the valid subcontracts, which courts are prohibited from doing. *See, e.g.*, *S.D. State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.*, 616 N.W.2d 397, 407 (S.D. 2000) ("It is not the function of [a court] to rewrite a contract." (citing *Kroupa v. Kroupa*, 574 N.W.2d 208, 217 (S.D. 1998))). The balancing the harms factor weighs in favor of denying the preliminary injunction.

## IV.   Public Interest

The public has an interest in ensuring that contractual agreements are enforced within the confines of the law. *See, e.g.*, *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007) (reasoning that the district court "did not abuse its discretion by concluding its grant of a preliminary injunction promoted the public interest by protecting freedom to contract through enforcement of contractual rights and obligations."); *E.W. Blanch Holdings, Inc. v. Knudson*, No. 01-775, 2001 WL 1618165, at *6 (D. Minn. May 10, 2001) (noting "that public policy favors the enforcement of valid contracts and the protection of legitimate business interests." ); *Marion v. Hazelwood Farms*

32

*Bakeries, Inc.*, 969 F. Supp. 540, 542 (E.D. Mo. 1997) ("[T]here is certainly a public interest in enforcing valid contracts[.]").

"[P]ublic interest does not favor forcing parties to an agreement to conduct themselves in a manner directly contrary to the express terms of the agreement." *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1026 (8th Cir. 1992). Thus, if granting the preliminary injunction would allow the parties to an agreement "to conduct themselves in a manner directly contrary to the express terms of the agreement," then the court should not grant the preliminary injunction. *Id.* (quotation omitted).

Moreover, there is a significant public interest in recognizing a tribe's sovereign right to regulate activities by nonmembers on tribal trust land and a tribal court's right to enforce those regulations, as long as that regulation falls within the confines of *Montana. See, e.g., Iowa Mut.*, 480 U.S. at 14-15 (reasoning that the federal government has consistently encouraged tribal courts' development).

Here, the parties entered into a valid contract and agreed that all parties necessary to resolve any claim arising out of the construction work would be parties to the same proceeding. If the court granted plaintiffs' preliminary injunction, plaintiffs would be allowed to financially benefit from accepting payment from the Tribe for a construction project on Tribal trust land but could escape recourse for their allegedly-deficient work by claiming that the

33

Tribal Court lacks jurisdiction over them. The public interest weighs in favor of upholding the contractual agreement. Furthermore, the public has an interest in allowing the Tribal Court to retain jurisdiction over a case that is within *Montana's* framework. Thus, the public interest factor weighs in favor of denying the preliminary injunction motion.

Because all four *Dataphase* factors weigh in favor of denying the preliminary injunction motion, plaintiffs' motion for a preliminary injunction is denied. Accordingly, it is

ORDERED that plaintiffs' motion for a preliminary injunction (Docket 3) is denied.

Dated March 26, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE